# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| TIMOTHY CRAIG TOMLINSON, | | |
| Plaintiff, | | No. C12-4038-MWB |
| vs. | | **REPORT AND RECOMMENDATION** |
| CAROLYN W. COLVIN, Commissioner of Social Security, | | |
| Defendant. | | |

Plaintiff Timothy Craig Tomlinson seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* ("Act"), and Supplemental Security Income ("SSI") pursuant to Title XVI of the Act. Tomlinson contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he was not disabled. For the reasons that follow, I recommend that the Commissioner's decision be affirmed.

## *Background*

Tomlinson was born in 1960 and has obtained a GED. AR 34, 122. He has past relevant work experience as salesperson (general), welder, machinist, maintenance mechanic, restoration supervisor, and auto service manager. AR 336-337. He suffered a myocardial infarction ("MI") on October 16, 2007. AR 210. He protectively filed his applications for DIB and SSI on November 14, 2007, alleging that the date of his MI is his disability onset date. AR 11, 122.

Tomlinson's claims were denied initially on June 3, 2008, and upon reconsideration on August 6, 2008. AR 11. He then then requested a hearing before

an Administrative Law Judge ("ALJ"). AR 78-79. On May 26, 2010, ALJ Jan Dutton held a hearing and on September 13, 2010, issued a decision denying Tomlinson's application. AR 11-20. On February 16, 2012, the Appeals Council of the SSA denied plaintiff's request for review. AR 1-5. As such, the ALJ's decision is the final decision of the Commissioner. AR 1; *see also* 20 C.F.R. § 416.1481.

On April 20, 2012, Tomlinson filed a complaint in this court seeking review of the ALJ's decision. This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues and the matter is now fully submitted.

## *Summary of Evidence*

I have reviewed the entire administrative record and provide the following summary of the evidence relevant to Tomlinson's claim:

### *A.    Medical Evidence*

Tomlinson suffered his MI on October 16, 2007, and was hospitalized for one week. AR 344-78, 390-400, 481-524. At the time of the MI, he was employed by Design Homes as a laborer. AR 37, 310-11. One week after leaving the hospital, he contacted Frank Addo, M.D., to request a note limiting him from work but was told to speak to his pulmonologist. AR 525. He was advised that once cleared by pulmonology, "he will be allowed to return to work." AR 525.

Tomlinson then saw Diane Drevs, a physician assistant, on four occasions from October to December 2007. AR 646-47, 652-54, 658-63. On December 18, 2007, he reported that he "feels well with minor complaints." AR 646. On January 4, 2008, Ms. Drevs released Tomlinson to return to work two days per week. AR 719.

On January 22, 2008, a stress test was discontinued due to shortness of breath. AR 526. Tomlinson's shortness of breath improved after the test was stopped. *Id.* Dr. Addo then released Tomlinson to return to work on a "fulltime work status" with avoidance of heights. AR 528.

In February 2008, Tomlinson was hospitalized for placement of an automatic implantable cardioverter defibrillator with pacemaker. AR 402-12, 534-46, 716-18. The discharge summary noted that since being discharged from his previous hospitalization, Tomlinson had "done quite well" and denied any chest pains. AR 403. He did, however, report shortness of breath after walking one block. AR 403. Later that month, a nurse at Dr. Addo's office examined Tomlinson's surgical wound and advised him to "continue to avoid heavy lifting and repetitive work for the next week." AR 546.

Tomlinson reported to the emergency room on March 22, 2008, and indicated that he had suffered chest tightness, sweating and nausea while doing some things around the house that morning. AR 448. He stated that the discomfort lasted about 20 minutes. *Id.* A chest x-ray and electrocardiogram were unremarkable. AR 449. He was symptom free while at the emergency room. *Id.*

On April 14, 2008, Tomlinson returned to Dr. Addo for follow-up. AR 549-51. He reported that after his discharge from AICD placement he was "doing quite well and able to resume nearly all of his activities without much restriction," but he began to have increased shortness of breath in recent weeks. AR 550. He also reported that he had resumed the use of oxygen at night. AR 551.

Tomlinson returned to Dr. Addo in June 2008, and reported shortness of breath after walking one block and occasional chest tightness relieved by use of nitroglycerin. AR 555. Dr. Addo concluded Tomlinson had Class II to III heart failure symptoms according to the New York Heart Association (NYHA) Functional Classification

System,[1] but "appear[ed] to be well compensated." AR 556. He advised Tomlinson to try to maintain a job that would give him health insurance. *Id*.

On August 26, 2008, Dr. Addo reported that Tomlinson denied chest discomfort but reported chronic fatigue. AR 558-59. He again noted that Tomlinson had NYHA Class II to III symptoms, but was "presently well compensated." AR 559. Two months later, Tomlinson continued to report fatigue and had developed intermittent dizziness. AR 565. Dr. Addo continued his prior NYHA Class assessment. *Id*.

On September 9, 2008, Tomlinson had an abnormal polysomnogram resulting in the use of a bipap machine at night. AR 623. On October 17, 2008, he complained of fatigue and intermittent dizziness and Dr. Addo again assessed him as NYHA Class II to III. AR 563-565.

Tomlinson reported to the emergency room on November 9, 2008, complaining of chest pain. AR 675-82. The following day, he reported fatigue, dizziness, and chest pain during exertion. AR 568, 589. Dr. Addo recommended a diagnostic angiography, which showed ejection fraction of 36 percent, but no critical obstructive coronary artery disease. AR 571-72, 590, 593-94. Tomlinson was found to have

---

[1] According to the American Heart Association, NYHA Class II functional capacity is defined as:

> Patients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain.

NYHA Class III functional capacity is defined as:

> Patients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain.

www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last visited March 15, 2013).

abnormal hemodynamics with an elevated left ventricular end-diastolic pressure, compatible with left ventricular dysfunction and left ventricular enlargement with moderate to severe global LV systolic dysfunction.   AR 572.

On November 14, 2008, Ms. Drevs reported that Tomlinson "feels well with minor complaints."   AR 632.   A few days later, he reported to the emergency room with a complaint that he became lightheaded and dizzy while working at Lowe's.   AR 575.   The issues resolved after about 30 minutes.   *Id.*   He was assessed with "a brief episode of hypotension."   AR 578.

In January 2009, Thomas Wente, D.O., noted Tomlinson's complaints of shortness of breath with activity and fatigue.   AR 628.   Dr. Wente's examination showed easy respiratory effort, normal breath sounds and normal heart sounds.   AR 629.   He diagnosed NYHA Class III, shortness of breath and coronary artery disease.   AR 629.

Tomlinson reported to the emergency room in May 2009 complaining of intermittent chest pain during the previous week.   AR 712.   He was hospitalized overnight for consultation with cardiology the following morning.   AR 715.

On July 9, 2009, Dr. Addo noted Tomlinson's report of shortness of breath after walking one to two blocks.   AR 698.   Dr. Addo recommended a stress test, which was stopped due to fatigue after six minutes.   AR 694, 698-99.   Tomlinson reported chest discomfort and shortness of breath during the test, with both conditions improving after the test concluded.   AR 694.   Dr. Addo found Tomlinson's post-stress ejection fraction to be 31percent and stated that he was NYHA Class II to III.   AR 699.

In October 2009, Ms. Drevs reported that Tomlinson felt "well with no complaints."   AR 725.   She further noted that he was "doing quite well, much better after changing jobs."   *Id.*

After the ALJ issued her decision in September 2010, Tomlinson submitted additional evidence to the Appeals Council.  AR 4-5, 760-90.  That evidence indicates he was hospitalized for two days in March 2011 after complaining that he suffered worsening fatigue, shortness of breath, and chest pain for two weeks.  AR 767-90.

## B.      *Medical Impairment Evaluation*

On June 9, 2010, Ms. Drevs completed an impairment evaluation based on her treatment of Tomlinson since October 2007.  AR 747-53.  She stated that Tomlinson suffers from coronary artery disease, left ventricle systolic dysfunction (with an ejection fraction of 35%), cardiomyopathy and memory loss.  AR 747.  She then described the symptoms, signs and laboratory findings of his impairments.  AR 748-49.  She indicated that he has followed treatment but that his medical condition has not improved and his prognosis is poor.  AR 748.

Ms. Drevs reported that Tomlinson could never lift or carry up to 10 pounds, that he could seldom reach in all directions except overhead, that he could never reach overhead and that he should never bend, squat, crawl, or climb.  AR 750.  She further stated he would never be able to perform at a rapid pace and would have a difficult time handling work at even a slow pace.  She opined that Tomlinson is unable to work due to shortness of breath.  AR 751.

## C.      *State Agency Medical Consultants*

Lawrence Staples, M.D., conducted a physical RFC assessment dated June 2, 2008.  AR 454-61.  He noted that Tomlinson had been seen on April 14, 2008, was doing well at that time, and was able to resume nearly all of his activities without much restriction, although he had been short of breath for the preceding several weeks.  AR 461.  He further noted that Tomlinson was without chest discomfort or peripheral

edema and was working part-time at Lowe's. *Id.* Dr. Staples concluded that Tomlinson would be capable of performing light work within twelve months of onset and that the twelve-month duration requirements of 20 C.F.R. §§ 404.1509 and 416.909 had not been met. In his opinion, Tomlinson was not disabled. *Id.*

On August 6, 2008, Dennis Weis, M.D., endorsed Dr. Staples' opinion, noting that on June 23, 2008, Tomlinson was seen for follow-up by a cardiologist and reported shortness of breath with significant standing and walking. AR 475-79. A physical examination was essentially unremarkable without evidence of edema and the EKG was unchanged from previous studies. AR 475. Dr. Weis stated Tomlinson was considered well compensated for NYHA Class II to III heart failure symptoms and was scheduled for follow-up. *Id.* Dr. Weis found no new evidence to document a worsening of Tomlinson's condition and reiterated Dr. Staples' conclusion that Tomlinson's impairments would not last at least twelve continuous months. *Id.*

### *Hearing Testimony*

### A. *Claimant's Testimony*

Tomlinson testified that he was 49 years old on the day of the hearing. AR 34. He has earned a GED and, as of the hearing, was living with his girlfriend and her child. AR 34-35. Tomlinson has three adult children of his own. AR 34. He testified that he worked as an auto mechanic for most of his life. AR 36. Prior to his MI in October 2007 he worked at Design Homes but testified that he could not physically do the work after the MI. AR 40-41.

Tomlinson began working at Lowe's part-time in March 2008. AR 40. He started working in the paint department 20 to 25 hours per week, but found the work too heavy. He was moved to the hardware department where the lifting requirements were less. *Id.* He left Lowe's and began working part-time at O'Reilly's Auto Parts in June

2008. AR 41. He testified that he sold auto parts, answered phones, assisted customers at the counter and made some deliveries. *Id.* He further testified that other employees helped him lift items that were too heavy, that he was allowed to sit and stand at the counter as he needed and that he uses oxygen for 2 to 5 minutes at a time at work. AR 41, 47.

Tomlinson testified that he has been unable to work full time since October 2007 because of fatigue, shortness of breath, and problems with concentration and memory. AR 45-46. He stated that he becomes very tired easily. AR 45. After four to five hours he needs to nap for 60 to 90 minutes. AR 48. He also testified that he naps during his lunch break. *Id.* He has arranged with his employer to work only two days in a row, as working more than that causes extreme fatigue. AR 51. He stated that even simple household chores caused fatigue. AR 49. Any exertion, even bending over to pick up a battery off of the floor or squatting down, will cause shortness of breath. AR 46. He testified that he had to use oxygen after walking up eight steps to get to the hearing room. *Id.*

In describing his memory problems, Tomlinson stated that he can forget a customer's order while walking from the counter to the shelf. AR 46. He has forgotten that a customer called in and he forgets when he is supposed to work. *Id.*

Tomlinson stated that he can stand for 15 to 20 minutes at a time, so long as he can walk around while doing so. AR 47. If he has to stand in one place, he could only do so for about 10 minutes. *Id.* He testified that he can sit for up to 20 minutes at a time if he is able to move around a bit. *Id.* He can walk for about a half of a block at a time and can safely lift up to 25 pounds on an occasional basis. AR 47-48. If he had to lift continuously, he would only be able to lift about 5 pounds. AR 48.

Tomlinson testified that his cardiologist restricted his work by telling him not to overexert himself. AR 42, 49. He explained that Dr. Addo told him to stop and rest if

he became tired.   AR 49.   He was also told that he would have to rest frequently and if anything he tried to do caused chest pains, then he should not do that anymore.   *Id.*

Tomlinson testified that he did not apply for unemployment benefits because of these restrictions.   He explained his understanding that he has to be "able and available" to work in order to receive unemployment and that he is "not able."   AR 42.

**B.**    ***Vocational Expert's Testimony***

The VE found that Tomlinson has past relevant work as a salesperson (general), welder, machinist, maintenance mechanic, restoration supervisor, and auto service manager.   AR 336-337.   During the hearing, he gave the following answers to hypothetical questions posed by the ALJ:

> Q.    First question is for light exertional work. If the Claimant could occasionally lift or carry 20 pounds frequently, ten pounds, stand, sit, walk six hours in an eight-hour day, could occasionally do postural activities, climb, balance, stoop, kneel, crouch, crawl. Should avoid concentrated exposure to cold or heat, as well as concentrated fumes, odors, dust, gases and should avoid dangerous equipment or ladders. With that functional capacity, can he return to any of his light work?
>
> A.    Your Honor, it would be my opinion that he would be able to return to the general salesperson position.
>
> Q.    What about store manager?
>
> A.    Your Honor, I guess I should address. I have two changes on the past relevant other than we talked about. The store manager position I had down in reference to his job in the restoration, and that would be an error. I would say that -- so I'm going to cancel the store manager job. The adult teacher we've already taken out. I'd like to add two jobs. One is a supervisor of home restoration. It relates to his content manager job from '05 to '07. It's a skilled job performed at the medium physical demand level, and then I'm going to add a position of an auto service manager. It's a skilled job performed at the light physical demand level, and that would have been done in 1996.

Q.    And you said that was skilled?

A.    Skilled level.

Q.    So that would have been within our 15 years. Okay.

A.    And based on that modification of the work summary, the two jobs that are light work that would fit within this hypothetical would be the salesperson position and the service manager position are both light work, Your Honor.

Q. Do you have any information as to how many of those jobs exist in the region or the nation?

A.    I should have, but I don't. Just one moment, Your Honor. Your Honor, the -- the sales position, retail sales occupation, regionally, which includes Nebraska, Iowa, Kansas and Missouri, approximately 70,000 positions, and nationally over two million positions. The service -- the auto service manager position, regionally, approximately 1,000 positions, and nationally, approximately 40,000, Your Honor.

Q.    Thank you. In addition to past work with that functional capacity, could he perform a wide range of light, unskilled work?

A.    Yes he would, Your Honor.

Q.    What percent of the full range do you feel would be retained?

A.    In my opinion at least 95% of the positions could be retained at the light, unskilled level, Your Honor, based on this hypothetical.

Q.    Thank you. Second question is if we reduced the functional capacity to sedentary, a job where he's not lifting or carrying over ten pounds on an occasional or frequent basis, and it's primarily a sitting job, he wouldn't be on his feet more than six hours in an eight-hour day, and then carry over the rest of the first hypothetical. With that functional capacity, does he have any transferrable skills to sedentary from the work

he has done in the past, including the factory work and auto work and sales work?

A.     Your Honor, it would be my opinion that he would have general clerical skills and customer service skills, cashier skills from his past work that would transfer into semiskilled sedentary work. Would be able to -- should be able to work as a sedentary cashier. DOT number 211.462-026. Regionally approximately 20,000 positions and nationally 700,000 positions. He should be able to work as a telemarketer, DOT number 299.357-010. Regionally approximately 30,000 positions and nationally over 300,000 positions. He should be able to work as a general clerk, DOT number 209.587-014. Regionally 20,000 positions and nationally 700,000 positions, Your Honor.

Q.     What is the source of the specific numbers you've given today for the five jobs.

A.     The source would be information based on the DOT's descriptions of jobs.

Q.     Is there any discrepancy between your testimony and the Dictionary of Occupational Titles in terms of jobs, exertional levels and skill levels?

A.     No there's not, Your Honor.

Q.     Thank you. Now the next question. You've heard the Claimant's testimony today, the symptoms and severity that he has endorsed. If those are considered to be credible, is there anything that you heard that would cause you to question whether he could do the type of jobs you've identified or any serious vocational concerns?

A.     Your Honor, based on the Claimant's testimony, two areas of interest. One would include his physical abilities to engage in work activities. The other one would be his ability to complete a normal workweek. He testified today that his physical abilities, walking, standing and sitting, plus his ability to lift are very decreased, and that -- also that he needs to lie down and take a nap after working four or five hours for an

hour to hour and a half, those would generally not be allowed in the workplace.

AR 56-59.

The VE testified further in response to follow up questions by Tomlinson's counsel:

> Q.    I would ask one based on the hypothetical #1. If he would need to be in a very low-stressed job because of the palpitations, the problems with the heart, would that affect the jobs that you have indicated were available?

> A.    You would have to be able to identify for me what is what you mean by low stress in this particular case.

> Q.    Well, he -- I'm sorry. He indicated that -- that things like scheduling, being busy, those kinds of things are stressful to him. So it would have to be a type of job where there is – there's not a lot of -- there's no quotas, having to get things done quickly within a schedule. That kind of activity would need to be minimal.

> A.    I'm not able to identify jobs where employers would –that would employ someone if there was no quotas and they didn't have to work within a schedule.

AR 59-60.

Finally, in response to an inquiry from the ALJ, the VE testified that the kind of part-time work Tomlinson performed since his alleged onset date was light work, consistent with his prior work as a general salesperson.    AR 60.

## Summary of ALJ's Decision

The ALJ made the following findings:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

12

(2)     The claimant has not engaged in substantial gainful activity since October 16, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

(3)     The claimant has the following severe impairments: Coronary artery disease, status post myocardial infarction on the alleged onset date, status post intervention by catheterization, and history of automatic implantable cardioverter defibrillator ("AICD") / pacemaker placement in February 2008; with hyperlipidemia (20 CFR 404.1520(c) and 416.920(c)). The claimant also has history of surgery to the cervical spine in 2000 and 2005.

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. He should avoid concentrated exposure to cold and heat, as well as concentrated fumes, dust, odors, and gases. He should avoid dangerous equipment and ladders.

(6)     The claimant is capable of performing past relevant work as a general salesperson and an auto service manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

(7)     The claimant has not been under a disability, as defined in the Social Security Act, from October

16, 2007, through the date of this decision (20 CFR
404.1520(1) and 416.920(1)).

AR 13-20.

The ALJ found that Tomlinson has the severe impairments listed above but also found that while Tomlinson has been treated for depression, that condition is not severe because it does not cause more than minimal limitation in his ability to perform basis work activities. AR 14. In making this finding, the ALJ indicated that she had considered the "paragraph B" and "paragraph C" criteria of section 12.00C of the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1) and determined that neither set of criteria are met. *Id.*

The ALJ also found that Tomlinson has no impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. Specifically, she determined that his cardiovascular impairments do not meet the criteria for listing-level heart failure. AR 14-15.

In explaining her RFC determination, the ALJ compared Tomlinson's statements about the intensity and effect of his symptoms to the objective medical evidence and found that his statements "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." AR 15. She gave weight to the opinions of the two state agency consultants, Dr. Staples and Dr. Weis, noting that they are acceptable medical sources and finding that their opinions are consistent with other medical evidence in the record. AR 16.

By contrast, she gave little weight to the opinion of Ms. Drevs, the physician assistant. The ALJ found that Ms. Drevs is not an acceptable medical source and that her opinions are inconsistent with the record as a whole. *Id.* The ALJ also gave little weight to a function report submitted by Tomlinson's fiancé, finding that it, too, was inconsistent with the medical evidence of record. AR 18.

14

The ALJ noted that Tomlinson's treating cardiologist had refused to provide an RFC evaluation, despite requests from both the ALJ and Tomlinson's counsel. AR 18. Indeed, the ALJ asked Tomlinson's counsel during the hearing if "there are any treating source opinions about disability" and counsel responded "no." AR 33. Counsel explained that she had asked Dr. Addo to provide an opinion but was advised that he does not "[f]ill out forms for disability cases." *Id.* In her ruling, the ALJ stated that she had mailed a RFC form to Dr. Addo but nothing was returned, "despite a lengthy post hearing period." AR 18.

After reviewing the medical evidence and weighing the various opinions, the ALJ concluded that Tomlinson's "symptoms and impairments are not as severe as alleged." AR 18. She further found that even if Tomlinson's impairments limited him to sedentary work, "prior to age 50, he could perform the full range of unskilled sedentary work and after age 50, he has transferable skills to sedentary work." *Id.* She noted that "he works at a light job currently." *Id.*

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that

there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### *The Substantial Evidence Standard*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not

subject to reversal simply because some evidence may support the opposite conclusion.").

## Discussion

Tomlinson raises two arguments in challenging the ALJ's decision:

A.    The ALJ failed to properly evaluate the opinion of a treating source on issues including impairment severity and functional effects pursuant to Social Security Ruling (SSR) 06-03p.

B.    The ALJ failed to properly apply the *Polaski* factors in determining the credibility of Tomlinson's subjective complaints.

Doc. No. 11 at 1.    I will address these arguments separately.

## A.    Treating Source Opinion

The Social Security regulations state, in relevant part:

Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(d)(2) [emphasis added].[2]   What this means is that a treating source's opinion is generally given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).   A treating source's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).   But that opinion will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.   *Hacker*, 459 F.3d at 937.

In this case, the only potential "treating source" opinion is that of Ms. Drevs, a physician assistant.   AR 750-52.   The ALJ considered her opinion, but determined that it was not entitled to great weight as (a) she is not an acceptable medical source and (b) "her limitations are inconsistent with the claimant's work since the alleged onset date . . . and with the record as a whole."   AR 16-17.   (Tr. 16, 17).

Tomlinson acknowledges that under existing Social Security regulations, a physician assistant (or "PA") is not an "acceptable medical source."   Doc. No. 11 at 8-9 (citing 20 C.F.R. §§ 404.1513(a) and 416.913(a)[3]).   He notes, however, that Social Security Ruling ("SSR") 06-03p nonetheless required the ALJ to give consideration to Ms. Drevs' opinion.   That ruling includes the following statements:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. *See* 20 CFR 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. *See* 20 CFR 404.1527(a)(2) and

---

[2] Section 404.1527 has been amended, with certain paragraphs being re-numbered.   All citations to that section in this ruling are to the version in effect during the relevant period of time.

[3] These regulations list "acceptable medical sources" who can "provide evidence to establish an impairment."   Physician assistants are not on the list.

416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. *See* 20 CFR 404.1527(d) and 416.927(d).

\* \* \*

In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:

- Medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists;

\* \* \*

Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity.

\* \* \*

Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

*See* SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). Among other things, this ruling means a PA's opinion (a) is not entitled to controlling weight and (b) cannot establish the existence of a medically-determinable impairment. However, a PA's opinion <u>can</u> be used as evidence of the severity of an impairment and how the impairment affects the individual's ability to function. An ALJ must evaluate the PA's opinion with reference to the same factors that apply to other medical sources, including:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s), and
- Any other factors that tend to support or refute the opinion.

*See* 20 CFR §§ 404.1527(d) and 416.927(d). "In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005).

Here, the ALJ followed the correct legal framework for considering the PA's opinion. Moreover, her conclusion that the opinion is inconsistent with the record as a whole is supported by substantial evidence. Ms. Drevs reported that Tomlinson could perform no sitting, standing, or walking – at all. AR 750. She further opined that he could never lift any weight – at all. *Id.* According to Ms. Drevs, the only functional capacity that Tomlinson could ever perform was seldom reaching in all directions except overhead. *Id.* She concluded that all other functional capacities were entirely precluded. AR 750-51.

The ALJ had sufficient grounds for finding that the record fails to support these extreme limitations. Ms. Drevs herself released Tomlinson to part-time work in January 2008 and Tomlinson's treating cardiologist, Dr. Addo, advised him in June 2008 to maintain a job that would give him health insurance. AR 526, 556. And, in fact, it is undisputed that Tomlinson was able to work part-time from April 2008 through at least the date of the hearing in May 2010. AR 16, 51, 139, 141, 143, 154-55, 279.

Moreover, in February 2010 Tomlinson reported that during an 8-hour workday, he could sit for 15 to 30 minutes at a time for a total of 4 hours, stand for 5 to 10 minutes at a time for a total of 2.5 hours, walk half a block at a time for a total of 1.5 hours and lift a maximum of 30 to 50 pounds. AR 333-34. During the hearing, he testified that he was able to stand for 10 to 20 minutes, sit for 20 minutes, walk half a block and lift 25

pounds occasionally. AR 47-48. The fact that Tomlinson himself contradicted the PA's opinion gave the ALJ a valid basis for discounting that opinion. *See, e.g., Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (noting that a physician's statements were contradicted by the claimant's own testimony).

In addition, two state agency medical consultants reviewed Tomlinson's medical records and found that his impairments were not disabling. AR 461, 475. While Tomlinson points out that his cardiologist, Dr. Addo, assessed him at NYHA Class II or III functional capacity, he cites no authorities holding that those classifications equate to an inability to engage in substantial gainful activity. As noted earlier, individuals at the Class II to Class III level are considered to have a "slight" to "marked" limitation of physical activity. *See* Note 1, *supra*.

In any event, it is the ALJ's duty to assess opinions and determine the weight to be given these opinions. *See Finch*, 547 F.3d at 936 ("The ALJ is charged with the responsibility of resolving conflicts among medical opinions."); *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'") (citing *Bentley v. Shalala*, 52 F.3d 784, 785-87 (8th Cir. 1995)). The ALJ was not required to give any particular weight to Ms. Drevs' opinion. She gave good reasons for her decision not to give that opinion great weight and those reasons are supported by substantial evidence in the record. As such, I reject Tomlinson's argument that the ALJ failed to properly evaluate Ms. Drevs' opinion.

## B.    *Claimant's Credibility*

As noted above, the ALJ found that Tomlinson's statements as to the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with her assessment of his RFC. "An ALJ who rejects [subjective]

25

complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). In assessing a claimant's credibility, the ALJ must consider "the claimant's prior work history; daily activities, duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Medhaug*, 578 F.3d at 816 (citing *Polaski*, 739 F.2d at 1322). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 894 (8th Cir. 2000)). However, lack of objective medical evidence cannot be the sole reason for discounting a claimant's subjective complaints. *Mouser*, 545 F.3d at 638. An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2009). The ALJ does not need to discuss each *Polaski* factor as long as he or she "acknowledges and considers the factors before discounting a claimant's subjective complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009).

The ALJ acknowledged the applicable factors here. AR 15. She then discussed the evidence of record that she found to be inconsistent with Tomlinson's statements, including objective medical evidence, the opinions of the state agency medical consultants, Tomlinson's ability to continue with part-time work, evidence of exercise testing which was consistent with heavy to very heavy exertion, his statement that he seldom used medication for chest pain and the lack of any medical opinion evidence of limitations that would render him unable to work.[4] AR 15-18. When the ALJ articulates the inconsistencies on which she relied in discrediting a plaintiff's subjective

---

[4] It is significant that no physician who examined Tomlinson noted limitations consistent with a finding of disability. *See Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000).

complaints, and when those inconsistencies are supported by the record, the credibility determination should be affirmed. *See Eichelberger*, 390 F.3d at 590 ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility."). The primary question is not whether Tomlinson actually experiences the subjective complaints alleged, but whether those symptoms are credible to the extent that they prevent him from performing substantial gainful activity. *See Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004) ("While there is no doubt the claimant experiences pain, the important question is how severe the pain is.")

The ALJ conducted a proper analysis of Tomlinson's credibility. She credited the subjective allegations that were supported by substantial evidence in the record and discredited those allegations that were inconsistent with other evidence in the record or had no objective support. The ALJ's credibility analysis, and her resulting RFC determination, are supported by substantial evidence. When that RFC determination is applied to the VE's testimony, the ALJ correctly found that Tomlinson can perform a wide range of unskilled light jobs and unskilled sedentary work. AR 19. As such, he is not disabled within the meaning of the Act.

### *Recommendation*

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the Commissioner's decision be **affirmed** and judgment be entered against Tomlinson and in favor of the Commissioner.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.

Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 15th day of March, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA